**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



Dated: January 24 2013

Mary Ann Whipple
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No.: 11-34511 |
| | ) | |
| Julie M. Uhrman, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Adv. Pro. No. 11-3261 |
| | ) | |
| Julie M. Uhrman, | ) | Hon. Mary Ann Whipple |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| U.S. Department of Education, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OF DECISION

This adversary proceeding is before the court for decision after trial on Plaintiff Julie M. Uhrman's complaint against substituted Defendant Educational Credit Management Corp. ("ECMC") seeking a discharge of student loan debt as an undue hardship.[1] The district court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §1334(b) as a civil proceeding arising in or related to a case under Title

---

[1] American Education Services was originally named as a defendant. Upon a stipulation and order to substitute parties [Doc. ## 19 & 20], ECMC was substituted as a party defendant. The United States Department of Education is also a named defendant. However, pursuant to an agreed order, it has no interest in this matter and will be bound by a resolution on the merits regarding the student loans in question should said loans subsequently be assigned to the United States. [Doc. # 15].

11. This proceeding has been referred to this court by the district court under its general order of reference. 28 U.S.C. § 157(a); General Order 2012-7 of the United States District Court for the Northern District of Ohio. Proceedings to determine the dischargeability of debts are core proceedings that the court may hear and decide. 28 U.S.C. § 157(b)(1) and (b)(2)(I).

This Memorandum of Decision constitutes the court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, made applicable to this adversary proceeding by Fed. R. Bankr. P. 7052. Regardless of whether specifically referred to in this Memorandum of Decision, the court has examined the submitted materials, weighed the credibility of the witness, considered all of the evidence, and reviewed the entire record of the case. Based upon that review, and for the reasons discussed below, the court finds that Plaintiff's student loan debt cannot be discharged as an undue hardship.

## FINDINGS OF FACT

### I. Plaintiff's Education and Student Loans

Plaintiff's student loans were incurred during 1992 to 1995 when she attended The Ohio State University, where she studied pre-veterinary medicine and psychology, and when she attended the University of Toledo, where she studied modern dance and art. She last attended the University of Toledo briefly and unsuccessfully in 2007. She did not complete her studies at The Ohio State University and did not obtain a degree in her studies at the University of Toledo. Plaintiff also studied at the Healing Arts Institute in Perrysburg, Ohio, where she graduated in 2001 with a degree in massage therapy. Her parents paid for her studies at the Healing Arts Institute and she incurred no additional student loans.

Although there was no testimony regarding the original amount of Plaintiff's student loans, in August 2005, she obtained a Federal Consolidation Loan, consolidating all of her student loan debt at that time. [Def. Ex. B]. As of September 4, 2012, the total amount due and owing ECMC, which presently holds the student loan debt at issue, was $55,893.71, including $53,723.73 in principal and $2,169.98 in interest that is accruing at an annual rate of 6.5%, or $9.56 per day. [Def. Ex. A].

Plaintiff began making payments of $100.00 per month on her student loans in 2001 and continued to do so until she suffered an injury at work in 2004. She has made no payments since that time. Plaintiff testified that after she was injured, she contacted her student loan lender and received a forbearance "for a couple of years." The record is silent as to the status of her loans or her contacts with the student loan lender since that time. She testified that she has not further investigated or considered any potential administrative relief to address her difficulty in paying her student loans. She testified that she had heard of the Income Based Repayment Program but did not understand it and saw no reason to look into it since

2

she had no income.

## II. Plaintiff's Employment History and Financial Circumstances

Plaintiff is an articulate thirty-eight year old single woman. She presents herself professionally. While in college and massage therapy school, Plaintiff was employed at various jobs, including employment in a campus dining area and as a computer programmer. After obtaining her massage therapy degree, she worked full time as a massage therapist from 2001 until June 2004. Plaintiff could not recall how much she was paid as a massage therapist. Plaintiff testified that while at work in June 2004, she tripped on exposed wires and fell into a wall, jamming her arm into her shoulder and losing consciousness for a short period of time. According to Plaintiff, prior to her fall, she was in good health. She testified that almost immediately after her injury, she began experiencing severe headaches, muscle aches, facial rash with ulcers in mouth and nose, hair falling out, and depression. She testified that she also experienced a few grand mal seizures, the most recent having occurred in July 2012 while she was in Georgia.

Plaintiff received Workers' Compensation benefits until September 2005 for the following conditions determined to be caused by her fall at work ("the allowed conditions"): right shoulder and elbow sprain and right brachial plexus lesions. The medical records in evidence consist of a radiology report dated August 14, 2004, physicians' reports regarding their examinations of Plaintiff and/or Plaintiff's medical file in connection with her claim for Workers' Compensation benefits, and a mental functional capacity assessment. On October 29, 2004, Ray J. Miller, D.O., examined Plaintiff. He reported that an MRI of her cervical spine completed on August 14, 2004, was normal and an MRI of her right brachial plexus on that date showed no evidence to suggest brachial plexopathy. [Def. Ex. O, p. 2; *see* Def. Ex. K]. He further reported that she had a normal range of motion in her right elbow and a near normal range of motion in her right shoulder. [Def. Ex. O, p. 3]. He opined that her shoulder and elbow sprain had stabilized and that she had reached "maximum medical improvement." [*Id.*]. He further opined that she could return to her former position of employment "with regards to the allowed conditions" but that she "may have other considerations, which may limit her ability to work, which are not allowed in the claim." [*Id.*].

On April 29, 2005, R. Dean Rasmussen, D.O., reviewed Plaintiff's medical file in response to a request for review of a decision denying reimbursement for additional physical therapy visits. [Def. Ex. T]. In his report agreeing with the decision denying reimbursement, he explained that shoulder and elbow sprains resolve within a maximum of twelve weeks and that brachial plexus lesions resolve when the sprain injury resolves. [*Id.*, p. 4]. He notes that the brachial plexus lesions resolved by mid-August 2004, as evidenced by the MRI completed on August 14, 2004. [*Id.* ].

3

The most recent medical report in evidence is that of David Garcia, D.O, after examining Plaintiff on August 11, 2006. [Def. Ex. BB]. His examination revealed a nine percent impairment in the range of motion of Plaintiff's right shoulder and no impairment in her right elbow. [*Id.* at 4]. He reported that her reflexes were intact, sensory testing and grip strength normal, and no muscle atrophy in her upper arm. [*Id.*]. Although Plaintiff was also seen by Dr. Blossom, her treating physician, she testified that she had not seen him in years as she has no medical insurance. No medical report by Dr. Blossom was offered as evidence in this proceeding.

Plaintiff testified that she sought counseling as a result of depression caused by her physical condition. A mental functional capacity assessment completed at the University of Toledo Department of Psychology Clinic and Training Center in 2006 after twelve months of individual therapy reports Plaintiff having a moderately limited "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances" and a markedly limited "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." [Def. Ex. AA]. However, the report states that Plaintiff is employable. [*Id.* at p. 3].

In June 2005, Dr. Blossom released Plaintiff to return to work in a light duty position with the following restrictions: no overhead lifting or lifting greater that ten pounds, no pushing, pulling, or repetitive movement, and no bending, squatting or sitting for periods more than one hour. [Def. Ex. W, p. 5]]. On June 28, 2005, Plaintiff was offered a position as a hostess at David Broadway Salon; however, did not accept the position. [*Id.* at 1]. According to Plaintiff, she did not accept the position because it would have involved her standing for long periods of time and because she still could not use her right arm very well at the time and the salon would not make any accommodations to allow her to sit when she needed to sit.

Plaintiff did attempt to work as a bartender in 2005. However, she only worked in that position for a couple of months since the job required her to stand for long periods. Plaintiff testified that she attempted employment again as a massage therapist in 2009, but left that job after one or two months because she experienced headaches, pain and spasms in her right arm. She has not actively sought employment since that time.

Although Plaintiff had lived on her own in an apartment in 2004 before her fall, within a few months after the fall, she moved in with her parents where she still resides. Plaintiff's income consists only of food stamps in the amount of $200.00 per month.

Plaintiff filed her Chapter 7 petition on August 18, 2011. Her bankruptcy Schedule F shows total

4

unsecured nonpriority debt in the amount of $87,559.00, of which $51,576.00 consists of student loan debt. On December 15, 2011, she commenced this adversary proceeding seeking a discharge of her student loan debt as an undue hardship.

## LAW AND ANALYSIS

Plaintiff seeks to discharge her student loan debt based upon the "undue hardship" exception to nondischargeability of such debt in 11 U.S.C. § 523(a)(8). Section 523(a)(8) provides for the dischargeability of a student loan obligation if "excepting such debt from discharge . . . will impose an undue hardship on the debtor and the debtor's dependents. . . ." The underlying purpose of this provision is "to prevent indebted college or graduate students from filing for bankruptcy immediately upon graduation, thereby absolving themselves of the obligation to repay their student loans." *Tenn. Student Assistance Corp. v. Hornsby (In re Hornsby)*, 144 F.3d 433, 436-37 (6th Cir. 1998).

Although the Bankruptcy Code does not define "undue hardship," the Sixth Circuit has adopted the test set forth in *Brunner v. New York State Higher Education Services Corp.*, 831 F.2d 395, 396 (2d Cir. 1987) for determining the existence of "*undue* hardship." *See Oyler v. Educ. Credit Mgmt. Corp. (In re Oyler)*, 397 F.3d 382, 385 (6th Cir. 2005).

Under the *Brunner* test, the debtor must prove each of the following three elements:

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Id.* at 385 (quoting *Brunner*, 831 F.2d at 396).

Although the Sixth Circuit has authorized courts to grant a partial discharge of student loan debt pursuant to § 105(a), such equitable adjustment is appropriate only where the undue hardship requirement of § 523(a)(8) is met as to the part discharged. *Miller v. Pa. Higher Educ. Assistance Agency (In re Miller)*, 377 F.3d 616, 622 (6th Cir. 2004). Before *Oyler,* courts in the Sixth Circuit at times found equitable adjustment of student loan debt under § 105(a) to be appropriate when debtors had a present inability to pay their entire student loan debt but did not satisfy the second or third prong of the *Brunner* test, that is, they failed to show that their financial adversity was likely to persist for a significant portion of the repayment period or that they had made good faith efforts to repay the loans. *See, e.g., Flores v. U.S. Dept. of Educ. (In re Flores)*, 282 B.R. 847 (Bankr. N.D. Ohio 2002); *Garybush v. U.S. Dept. of Educ. (In re Garybush)*, 265 B.R. 587 (Bankr. S.D. Ohio 2001). Under *Oyler,* however, all three prongs of the *Brunner* test must

5

now be satisfied for the court to find undue hardship. A debtor seeking an undue hardship discharge bears the burden of proof by a preponderance of the evidence. *Chime v. Suntech Student Loan (In re Chime)*, 296 B.R. 439, 443 (Bankr. N.D. Ohio 2003).

The first prong of the *Brunner* test contemplates that a debtor is first entitled to provide for basic needs for food, clothing, shelter, medical care and transportation for herself and her dependents, if any, before repaying student loan debts. In applying this test, the court must therefore evaluate a debtor's household income and expenses, focusing particularly on what expenses are necessary to realistically maintain a basic standard of living and then determining whether there is income left over with which to pay student loan debts.

In this case, the first prong of the *Brunner* test is satisfied. Plaintiff's only income is $200.00 per month in food stamps. Under Plaintiff's current financial circumstances, the court finds that she cannot maintain a minimal standard of living for herself without the assistance of her parents with whom she resides even without any student loan payments being made.

Under the second prong of the *Brunner* test, a debtor's financial adversity is required to be more than a temporary state of affairs. *Hatfield v. William D. Ford Federal Direct Consolidation Program (In re Hatfield)*, 257 B.R. 575, 582 (Bankr. D. Mont. 2000); *see also Hornsby*, 144 F.3d at 437 ("Courts universally require more than temporary financial adversity. . . "). A debtor must show additional circumstances indicating that her distressed state of financial affairs is likely to persist for a significant portion of the repayment period. *Oyler*, 397 F.3d at 386. "Such circumstances must be indicative of a 'certainty of hopelessness, not merely a present inability to fulfill financial commitment.'" *Id.* (citing *In re Roberson,* 999 F.2d 1132, 1136 (7th Cir. 1993)). These circumstances may include, among other things, illness or disability. *Id.* at 386. Implicit in the requirement that a debtor's state of affairs is likely to persist for a significant portion of the repayment period is that the debtor's financial state be the result of events that are realistically out of the debtor's control. *Kirchhofer v. Direct Loans (In re Kirchhofer)*, 278 B.R. 162, 167 (Bankr. N.D. Ohio 2002). Thus, the debtor must establish that she has taken all steps possible to improve her financial situation. *Id.* The purpose of this requirement is to give effect to the clear congressional intent – exhibited by the use of the word "undue" in § 523(a)(8) – that a student loan obligation be more difficult to discharge than other nonexcepted debts. *Rifino v. United States (In re Rifino)*, 245 F.3d 1083, 1088-89 (9th Cir. 2001).

Where "additional circumstances" are premised on the debtor's health, "the debtor must precisely identify her problems and explain how her condition would impair her ability to work in the future." *Tirch*

6

*v. Pa. Higher Educ. Assistance Agency (In re Tirch)*, 409 F.3d 677, 681 (6th Cir. 2005). Expert medical testimony is not necessary to meet a debtor's burden of showing that her medical condition impairs her ability to work now and in the future. *Barrett v. Educ. Credit Mgmt. Corp. (In re Barrett),* 487 F.3d 353, 360 (6th Cir. 2007). Nevertheless, even though expert medical testimony is not required, where it is not otherwise apparent from the nature of the condition as described by the debtor or from the court's observation of the debtor, some corroborating evidence must be given supporting the debtor's position. *See Swinney v. Academic Fin. Servs. (In re Swinney*), 266 B.R. 800, 805 (Bankr. N.D. Ohio 2001) (cited approvingly in *Barrett* and stating that "such evidence should consist of more than simply bare allegations; that is, whenever a debtor's health, whether mental or physical, is directly put at issue some corroborating evidence must be given supporting the proponent's position").

In this case, Plaintiff has failed to meet her burden under the second prong of the *Brunner* test. Plaintiff is an intelligent, articulate woman with a potential remaining work life of nearly thirty years. While she has experienced certain physical ailments, at least in part due to her fall at work in 2004, the medical records in evidence do not support a finding that she is unable to work in any capacity. The court understands that the focus of the medical opinions contained in these records was to determine what injuries were caused by her fall at work and whether those injuries entitled her to Workers' Compensation benefits. Conditions unrelated to her injury were not matters that were necessarily addressed. Nevertheless, Plaintiff's own treating physician released her to work in a light duty position as early as June 2005.

It was not apparent from either Plaintiff's testimony regarding her physical and psychological condition or the court's observation of Plaintiff at trial that her present state of health as described by her is likely to persist for a significant portion of any student loan repayment period. Plaintiff testified that, although she has good days and bad days, her condition over the past six months has improved and that she believes she could work if she had the resources to obtain medical care for pain management and control of seizures. There is no testimony that Plaintiff is taking any medications at all for such purposes at this time and no testimony as to her efforts to secure the resources to get the medical care she believes is necessary to enable her to work. Plaintiff referenced that she has access to medical care only through CareNet, but did not explain what resources CareNet does or does not or cannot or will not provide to her. One statement Plaintiff made particularly stood out to the court, words to the effect that she needs to find a doctor that will treat her and not tell her it's all in her head and that she needs to se a psychiatrist. The court infers from this statement that Plaintiff disagrees with what she is being told by medical professionals about her medical situation. To the extent that Plaintiff is not able to work now but by working with

7

medical professionals will be able to work in the future, she has not met her burden of showing her distressed state of financial affairs is likely to persist for a significant portion of the student loan repayment period.

The court may also consider a debtor's work history in projecting whether her current state of affairs is likely to persist. *Barrett*, 487 F.3d at 360 (citing *Cheesman v. Tennessee Student Assistance Corp. (In re Cheesman)*, 25 F.3d 356, 360 (6th Cir. 1994)). Plaintiff unsuccessfully attempted to work as a massage therapist again in 2009, which she left because of headaches and spasms in her right arm. However, as a general rule, an existing circumstance that impairs a debtor's ability to work must impair her ability to do any kind of work that would improve her financial condition, not just work within her chosen field. *See United Student Aid Funds, Inc. v. Paolini (In re Paolini)*, 124 F.3d 199 (Table), 1997 WL 476515, *5 (6th Cir. Aug. 19, 1997) (citing *In re Brunner*, 46 B.R. 752, 757 (Bankr. S.D.N.Y. 1985), and *In re Fischer*, 23 B.R. 432 (Bankr. W.D. Ky. 1982)). Plaintiff rejected a light duty job offer as a hostess at a salon in 2005 because, according to her testimony, she thought she would have to stand too much. Yet the job description in the record, [Def. Ex. S], shows the court otherwise and she refused to event try it. She had also previously tried to work was as a bartender in 2005, which she left after two months because it required her to stand for long periods of time. Plaintiff testified that she has not actively sought employment for over three years. As Plaintiff has made no attempt to find employment within her physical capabilities, the court cannot conclude that she has met her burden under the second prong of *Brunner*.

Finally, under the third prong of the *Brunner* test, a debtor must demonstrate that she has made a good faith effort to repay the loans. The good faith requirement does not mandate that payments must have been made when the debtor's circumstances made such payment impossible. *See Alston v. U.S. Dept. of Educ. (In re Alston)*, 297 B.R. 410, 414 (Bankr. E.D. Pa. 2003); *Grove v. Educ. Credit Mgmt. Corp. (In re Grove)*, 323 B.R. 216, 226 (Bankr. N.D. Ohio 2005). Rather, a court should look at the totality of the circumstances in determining a debtor's good fath with respect to the student loan. *Afflitto v. United States (In re Afflitto)*, 273 B.R. 162, 171 (Bankr. W.D. Tenn. 2001). Factors courts typically consider in this analysis include the following:

> (1) whether debtor's failure to repay a student loan obligation is truly from factors beyond the debtor's reasonable control;
> (2) whether debtor has realistically used all available financial resources to repay the debt:
> (3) whether debtor is using her best efforts to maximize earning potential;
> (4) the length of time after the loan first becomes due after debtor seeks to discharge the debt;
> (5) the percentage of student loan debt in relation to debtor's total indebtedness; and
> (6) whether debtor obtained any tangible benefit from the student loan obligations.

8

*Flores v. U.S. Dept. of Educ. (In re Flores)*, 282 B.R. 847, 856 (Bankr. N.D. Ohio 2002). This court also considers whether the debtor has maintained contact with her student loan lender when unable to make payments on her debt and whether she has utilized administrative remedies that may be available to her during that time.

This is not a case in which a debtor is seeking a discharge of student loan debt when on the verge of reaping the benefit of her education. Plaintiff filed her petition over twelve years after attending college, and she obtained no tangible benefit from her student loan obligations. Although her student loan debt constitutes nearly 60% of her unsecured debt, the court does not find that to be a significant fact in its good faith determination. Rather, Plaintiff's failure to demonstrate the first and third factors set forth above and that she has maintained contact over the years with her student loan lender convinces the court that she has failed to meet her burden of showing a good faith effort to repay her loans.

Plaintiff did use her available financial resources to make payments on her student loan debt while she was working in 2002 until her accident at work in 2004. Although Plaintiff has not worked steadily since that time, she contacted her student loan lender and requested and obtained a forbearance "for a couple of years." The record is silent, however, as to whether Plaintiff requested or received any administrative remedy or even maintained contact with her lender thereafter. She testified that she had heard of the Income Based Repayment Program but did not understand it and saw no reason to look into it since she had no income. Had she maintained contact, Plaintiff may have been able to address her student loan debt through this repayment program. *See Tirch*, 409 F.3d at 682-83 (explaining that, while not determinative, the availability of advantageous administrative payment alternatives is a relevant factor to be considered by the court in addressing good faith repayment efforts).

And for the reasons discussed earlier, to the extent that she is not now employable even in a light duty position, Plaintiff has not shown that she has used her best efforts to become employable. Plaintiff believes that she could work if her pain and seizures were under control. But there is no testimony that she is taking any medication for such purposes and no testimony regarding efforts to secure the medical care and medication that would enable her to work. For these reasons, the court cannot conclude that Plaintiff's failure to make any student loan payments since 2004 was due to factors beyond her reasonable control or that she used her best efforts to maximize her earnings during the relevant time period.

## **CONCLUSION**

Plaintiff having failed to meet all three prongs of the *Brunner* test, the court cannot find that payment of her existing student loan debt, or any part thereof, would be an undue hardship. Judgment will, therefore,

9

be entered on the complaint in favor of Defendants. A separate judgment effecting this Memorandum of Decision will be entered by the court.

###